Consumer Financial Protection Bureau v. Clear Creek Legal v. Ryan Sasan. Case numbers 24-697-24727, 24-583 and 24-554. I guess the high school kids don't want to hear me. I don't know. Good morning. Good morning, your honor. Please proceed. Thank you. Good morning. May it please the court. My name is Tim Elliott, and I will be speaking on behalf of the appellants this morning. This is a case of severe overreach, both by the plaintiffs and by the trial court. The relief awarded below by the Western District of New York was extreme. It was contrary to law, and it was unsupported by evidence it should be vacated. At the outset, I want to start by talking about what this case is not. This is not a criminal case. It's not a fraud case. There's no finding by the trial court that consumers were misled or deceived. There's no finding by the trial court that the defendants... Aren't there some findings that in those initial phone calls there was some deception? No, there is no finding from the court on that. Well, they were calling because they were told they could get a loan, and then they were then induced into signing up for a debt relief program instead of getting a loan. So the evidence on that, which was not really developed because the trial was limited to the issue of the TSR, was that if people were eligible for a loan and met the underwriting, they could get a loan product, and if they could not, then they would be given other alternatives. So it was that the vast majority did not get a loan. The vast majority were not referred out for a loan, but instead were induced to sign up for the program. I think it was something like an 80-20 on that, Your Honor, but the evidence is that the credit was run, and the ones who had credit that would satisfy the underwriting got the loan. But the trial court didn't really make any findings on that, that that was deceptive, because they didn't really have the evidence on that. The claim that was litigated was actually something much more mundane than that, and that was that these law firms were charging advanced retainers, which lawyers do. And the government's claim was that they did not have a sufficient or robust enough face-to-face meeting before being engaged to justify the advanced retainers. And the government's claim was not based on well-established law. It was based on a novel interpretation, never before accepted or adopted by any court until this court of the TSR. I also want to point out that this case is not a Madoff-like case, where emergency action was necessary to prevent money from disappearing or going overseas. The defendants and the law firms have been operating in the same way for 10 years. They've been using generally the same models for about 10 years. There was no emergency. They weren't operating in secret. These were large, well-established companies, and the CFPB knew all about what they were doing. I would encourage you to look at page 9506 of the appendix, which has our discovery response to the CFPB in 2020. In light of that, what happened below and the relief that was awarded is truly shocking. On day one, the government went in ex parte, froze everyone's assets, 50 parties, 50-plus parties, a complete asset freeze. The receiver shut down a billion-dollar business and put 1,000 people out of work and left 65,000 law firm clients without ready representation. All on day one, before the defendants had any opportunity to respond. Now, the magistrate judge ultimately issued a 56-page opinion in this case. But that opinion is noteworthy in that much of it is not supported by any evidence that was presented during the two-day hearing. There's no evidence cited by the magistrate judge to support the need for an asset freeze. None. There's no evidence provided to support the need for a receiver.  Incorporated by reference, Judge Villardo's finding on the TRO, which was in fact that the asset freeze is necessary to avoid the dissipation of assets. And that, respectfully, with respect to both Judge Romer and Judge Villardo, that's a hollow gesture. Because Judge Villardo devoted exactly one sentence to that in his order. Which, incidentally, he just signed the order that was provided to him by the CFPB. But there's no evidence presented to him in those affidavits that could have supported that. The only affidavit that comes even close at the TRO stage, the only affidavit, is one from Timothy Hansen. But that talks about transfers in 2016 and 2017 and 2018 that weren't even wrongful transfers. They were payments to vendors and distributions to owners. Is your challenge now to the TRO or is it to the preliminary injunction? It's to the preliminary injunction. Yes. So the question was whether these face-to-face meetings satisfied the exemption.  And it seems to me the magistrate judge did make detailed findings that they did not. Supported by testimony from the notaries that they weren't there to sell. They weren't there to do anything substantive. I mean, how are those findings clearly erroneous? They're clearly erroneous, but there also is a fundamental underlying error of law. There is support. There seems to be support in the record for those findings. In particular, the testimony of the notaries, testimony of customers. There was indeed a two-day hearing, which is unusual for a preliminary injunction. But how are those findings clearly erroneous? The findings relate to issues that are side issues and irrelevant to the analysis under the TSR. How are they irrelevant if it goes to whether these were genuine, substantive meetings by the seller of the services? Sure. Start with the fundamental fact that every client got a face-to-face meeting. In their preliminary papers, the government denied that happened. At the preliminary injunction, it was shown that everyone got the face-to-face. Number two, the average length of a face-to-face meeting, this is the government's number, 38 minutes. That's a long meeting in someone's house, 38 minutes. The third point, and I took this out, every client got a 20-plus page PowerPoint presentation and a retainer agreement. And this is the document. It's at page 9938 in the appendix. I hope you take an opportunity to read through it, because the testimony from the notaries was that they went through it page by page with the clients. And this tells everything about the program. Wasn't there testimony that a lot of this was pro forma, that some of the meetings took 10 minutes? I mean, some of the meetings may have taken more, but there was lots of testimony. I mean, there was evidence going both ways, and the trial court made its findings. So the evidence was the median or the average was 38 minutes. And the government focuses, as I guess I would if I were them, on the ones that were short. But for every one that's short, there's a corresponding one that's long. And the testimony from the notaries who actually showed up and testified, Ruth Brooks Ward said she spent 90 minutes, 90 minutes walking through and literally reading page by page. Long or short, it has to be by the seller. And these notaries testified, some of them did, none of them testified otherwise, that they were not agents for the purpose of selling, that they were so constrained by the need to limit themselves to the slides and the brochure and everything else that they were basically walking brochures rather than sales agents. And the district court credited that. So why is that? Where's the error? But the very way that you frame that demonstrates that our position is correct, and I'll tell you why. Because what the court said, what the magistrate judge said is, well, these people weren't agents. They didn't view themselves as selling a product. That's not the way that they viewed themselves after the fact. They all testified that they followed the instructions. They got the script. They got the presentation. They showed up at the appointed time. They all testified. Every one of them testified they followed the instructions. But they said subjectively, I just didn't feel like I was there to sell. I thought I was there to get signatures and to inform. But the element of control. The document said you are not there to try to talk the client into enrolling. Right? It's not just what they felt. I mean, they were instructed not to sell debt relief services. They were there to inform. And that goes to what the term sales presentation means. Did the document say that? In other words, again, whether you agree with it or not, was there evidence to support the finding that they were not sellers? No, I don't believe so. I think the evidence unequivocally showed that they were there as agents. Because they were recruited. They signed up. They followed the law firm's instructions. Were they agents to sell? They were agents of the law firms as part of an overall sales process. Their subjective motivation was not to sell. But I don't think that's required as part of a sales presentation. And if you look at the Telemarketing Act and the TSR, it's designed to protect consumers against strong-arm sales tactics. And what the trial court said is, well, from the term sales presentation, I infer that that means you have to be motivated. You have to be there to close the sale. Respectfully, I don't think that's what the FTC had in mind when they issued that. I think the nudge court got it correct. When the nudge court said sales presentation is showing up to present something, to discuss something, and that something has to be the service or product that is ultimately being marketed. And that's what they did here. They had a substantive face-to-face. And that's fully consistent with what the TSR and the Telemarketing Act are set out to accomplish. The other part of that that creates a bit of an absurd result is, under the trial court's reasoning, if the exact same presentation had been given by someone who was a really aggressive salesperson, who was going to get a big commission, if this exact same presentation had been given, that would satisfy the trial court. And that's not consistent with the overall purpose behind the TSR and the Telemarketing Act. And the point I want to emphasize in getting to this is, the analysis has to start with the Telemarketing Act. The trial court didn't look at it. But the Telemarketing Act is the first place. And the Telemarketing Act is quite narrow. It relates to telemarketing. Congress was concerned that people were going to get strong-armed into these transactions over the phone and give their credit card information up. The Telemarketing Act doesn't govern all types of sales transactions, just telemarketing. And the authorization given to the FTC was correspondingly narrow. So before you get to that, which is a separate argument, I think, let me just go back to sales representation and the TSR and the regulation. So your interpretation, I think, is that a sales presentation removes a sales transaction from the scope of the TSR as long as it occurs in person, right? Correct. With a presenter that provides information to a consumer regarding the goods or services to be sold. That's correct. Is that right? That's correct. Okay, that's fair. And it seems to me, but this is really in the form of a question, that in connection with the evidentiary hearing that Justice Chin mentioned and that the district court – that the court conducted, it made findings. And so findings that I believe are subject to clear error review. And one of those findings is that notaries, based on the testimony of Elkins and others, the notaries who show up did not – and I'm reading – did not read the script to the consumers or make any type of presentation. There was a recorded phone call of employees at Strategic who stated that all we do in these meetings with the notaries is just get these people to kind of pencil whip – query what pencil whip means – pencil whip and sign the contract. Evidence – there was also evidence that Strategic employees would specifically tell potential customers over the phone that the notaries would be unable to answer their questions about the law firm's debt because they've got this, right? This – at 9938, the model, would be unable to answer their questions about the law firm's debt relief services. And also evidence that the notaries would tell customers in person that any questions they might have about the debt relief services would be answered by a sales representative. So if after an evidentiary – so I'm sympathetic. Let's say that you're right about your reading of the TSR separate and apart from what I think is the Bill Burbright argument that you're getting to. But let's say that you're right about this reading and that your interpretation of the rule is correct. You've got all of these evidentiary findings or findings based on an evidentiary hearing that seem to suggest that even if your reading is correct and if we – but if we credit these findings, you can't prevail. So take me – take me – help me. Take me through this. Sure. I want to start with the answer as a matter of law, and then I'd like to address each of the – I think there's really three categories of evidence that you recited. As a matter of law, here's why those findings are really irrelevant. Once there is a face-to-face component to the transaction – it's no longer telemarketing. As you predicted, Your Honor, that's exactly where I was going. Once there's a face-to-face meeting, you're outside the scope of the Telemarketing Act, and you're really outside the scope of the TSR. The way that the FTC drafted the TSR in 1995 was they said our rules don't apply if there's a face-to-face meeting. That's the other argument. Right. Period. Hard stop. If there's a face-to-face meeting, it doesn't apply. There's nothing in there that says the face-to-face meeting has to be a certain length or cover certain subjects or be by a certain person. Once there's a face-to-face, these rules don't apply. And so where the trial court erred is it went beyond that sort of absolute exclusion that's in the TSR and began to add requirements. Well, it has to be an employee. It has to be the right person. They have to be able to answer questions, and all questions. And there's a difference on that, which I'll get to in a minute because there's an important distinction in the testimony on that. That's what was going on. This absolute exclusion. But you added a requirement, and I think you agreed with me at the beginning. It occurs in person, so face-to-face, with a presenter providing information to a consumer regarding the goods or services being sold. Right? Sure. That's the way we interpret a sales presentation. If there is an in-person component with somebody who's showing up and they're talking about whatever the product or the service is that's being sold, that's a face-to-face sales presentation. And it doesn't need to be the first part of the process. It doesn't need to be the last part. It can come in the middle. Would you agree that it has to be meaningful? I mean, meaningful, just in a reasonable reading. It can't be a face-to-face meeting where I just say, hi, I'm a notary, and then leave. That's not enough. So it's got to be meaningful. It's got to be, right? I would agree. It can't be a flyby. There has to be some meaningful interaction. I would agree with that. All right, so what does pencil whip mean? I don't know what it means. But here's what I know about that conversation. That was a conversation that occurred in 2018 between two people at Strategic who the evidence at the hearing showed actually had no involvement with and no knowledge of what was going on. That was a conversation between two executives at Strategic who were saying, hey, we're seeing a lot of people dropping out of the program earlier. I wonder why that is. Maybe it's because the presentations aren't good enough. It was speculation. And what the government did with that is, in my opinion, quite wrong. They took off the 2018 date on that. They didn't disclose that date to the trial court. They put a 2023 date on there, which was the date of transcription, and presented it to the trial court as though it was a discussion by people with knowledge. They misleadingly called one of them the vice president of sales, which a court, I believe, would think, well, this is somebody who must know. This is part of the sales. And they presented it to the district court. So both the date and the title were wrong. And Mr. Callahan admitted that during the hearing. So that particular conversation, I don't believe any weight should be afforded to that. It's seven years old by people without knowledge, and really underscores the reason why these things should not be granted ex parte, because we would have had a response to that. The second point that you raised was, I think you were perhaps reading from the trial court's opinion on questions. Yes. The testimony at the hearing was that the notaries wouldn't answer questions beyond the materials. Beyond the materials. And that's a significant limitation, because the materials cover a lot of ground. And if you go through the testimony from Ruthbrook's ward, Heather Lyons, the ones who testified via deposition, they all said, well, if I got a question, and it was in the materials, I would point them to the place in the materials where it was. Or I would answer the question based on the materials or the script. That covers a lot of ground, because these materials describe the entire program. Even the trial court acknowledged that, hey, these materials cover everything. Good, bad, the fee structure, everything. And their testimony was, if there's something beyond the materials, then they would go back and call back to the firm and try to get an answer. But the other testimony that's significant is, that happened very seldom. What the notary said is, it wasn't very often we got questions beyond the materials, probably because they understood it. Heather Lyons was asked the question, hey, did people ask you questions about what this would do to their credit? And she said, no, because it's in the material. They knew it. The other component that disturbed the trial court, though. But she also said that it was her sense that the decision, I'm just reading from the court decision. It was her sense that the decision to enroll in the debt relief program was made by consumers before she met with them to notarize their signature on the contract. She testified it was, it is, and it was. She 100% said that. And that testimony shouldn't be surprising. Because by the time in the process where someone gets to this, they've already heard all this information at least once, and in some cases, twice. So the fact that a consumer or potential client of the law firm shows up at these face-to-face presentations and has pretty much already decided, hey, I think I'm going to do this. That doesn't mean the sale has been closed. Because the way this is structured is the payment information isn't obtained until the very end. The contract isn't signed until the very end. And the contract very clearly says, even though you, the client, are signing today, something else has to happen before you become a client. You have to have a call with a lawyer. And if that lawyer goes through that call and concludes that you are a good fit for the program, and then the lawyer countersigns the materials, then you can become a client. So whether or not the potential client is pretty much already there, that doesn't mean the deal had closed. It's factually and legally impossible for that to have happened. And the testimony from a number of the notaries, and I can give you the sites if you want them, was a lot of people wouldn't sign. Up to 10%, 20% of them would say, hey, thanks for the information. You know, I think I've changed my mind. That couldn't happen if the deal had already been closed. I do want to give you some time to address briefly what I think is the subject of your motion to vacate a remand, but also Mr. Sasson. I'm sorry, Mr. Sasson, I think Ryan's son. Correct. And I want to be very clear. The relief we're seeking is vacation. If this court does not feel it can vacate, we obviously would welcome a remand for further findings. But we really firmly believe vacation is appropriate here.  Vacature, yes. Vacation sounds much better. That actually sounds pretty good. The analysis, as I said, has to start with the Telemarketing Act. And I think I've already covered this, so this might be a little bit repetitive. The Telemarketing Act just covers conduct on the phone. You didn't make any of these arguments to, I think, to Judge Villardo, did you? In other words, did you, this all preceded Locobrite, is that correct? So the trial court proceedings and the opening briefs all occurred before the Locobrite decision was issued. I think it was issued maybe after the opening brief, but before the response brief, somewhere in there. And so we did make the arguments about the need to start with the statute and the need to look at the regulation in light of the statute. And even under Chevron, we felt quite firmly that those were meritorious arguments. Locobrite, though, seals the deal, in our view, and we would submit seals the deal. Because when you look at that TSR, you're confined by what Congress authorized you to do, or authorized the FTC to do. And the FTC does not get to regulate the content or the substance of a face-to-face meeting. It doesn't get to craft rules about how long it has to be, who has to be there, who has to deliver it, all of that. It says the meeting has to be direct, substantive, and personal. Do you have a problem with that language? Is that language inconsistent with the statute? That language, I believe, is consistent with the statute. That's from the FTC guidance. And that, I think, goes to the point that Judge Lohier was making, which is we would agree. But what is the problem with the rule that you're – that you have – what is the problem with the rule? I think as – If you don't have a quarrel with that, that it has to be a meaningful interaction, then I don't know what the problem is that you're concerned about. I don't believe the rule as written is inconsistent with the statute. I would agree with you on that. My problem is the way – I'm not sure why we have a Chevron or Loper problem then. Our argument is that the way the rule was applied by the district court creates those issues because he added these components. And this is also underline or avoid for vagueness challenge. He added these components like, hey, you have to be able to answer every question or most questions or a lot of questions. It's not clear. By the way, I don't know what the standard would be on that. It has to be delivered by an employee of the company. That's not in there anywhere. I mean, the requirements that he added create a problem as applied. And if the standard is, does it have to be in person and substantive and meaningful? We're so far on the other side of that line, it's crazy. This is a 38-minute on average presentation that covers all of this material. That unquestionably, unquestionably satisfies that. I want to give you some time for, do you have some time for rebuttal? We'll hear from the other side. Thank you, Your Honor. Good morning, Your Honors. May it please the court. Sarah Rosenbluth from the New York Attorney General's Office for Appellees. After a two-day evidentiary hearing, the district court found that defendants had likely engaged in an illegal scheme to collect advance fees for debt relief services, and that the exemption for face-to-face sales presentations by the seller likely did not apply on the facts of the case. These findings easily withstand clear error review. The undisputed evidence in the case, including from defendants' own witnesses, is that the notaries on whom defendants relied to complete the face-to-face sales presentations were responsible only for collecting signatures from consumers and did not act as the law firm's agents for the purpose. Hypothetically, suppose they made material misrepresentations, these notaries. Your position would be that they were not agents of the law firms? Well, I think you'd have to analyze what purpose they were acting for. But in this case, they're not- Well, presumably, if they were making misrepresentations designed to get people to subscribe for the service, they would be selling. Right, and I think it could be the case that on the facts of this case, the notaries were agents for some limited purpose. And so if they were, and they did agree that they were- I'm asking you if they made misrepresentations, material misrepresentations, that duped people into buying these services, I'm pretty sure your position would be that they were acting as agents. Yes, I think that would be our position, but I don't think that undercuts- They would then act by the seller. I don't think that that, no, because if we were trying to hold them liable for misrepresentations, the terms of the face-to-face exemption would not apply. And so we would simply be analyzing whether an agent of theirs made misrepresentations in the course of this enterprise. But here, we're looking solely at the terms of the exemption. And so here, it's specifically relevant under the text of the exemption whether the presentation is made by the seller. Now, it's undisputed that the actual seller was not conducting these meetings, so the question is, were the notaries agents of the seller for the purpose of selling? And so, for example, Lisa Munyon, the owner of the NPN notary firm, testified for defendants at the PI hearing and stated unequivocally that, quote, the notary representatives do not act as sales agents. That's at page 1311 of the joint appendix. That is consistent both with the contract with the notary companies, which disclaimed any agency relationship, and is also consistent with the understanding of virtually every other player in the process, including the notaries themselves, the consumers, and strategic telemarketers, who themselves were the true sales agents. Well, an agent is just somebody who is acting on behalf of somebody else and is authorized to do it. And, I mean, you would agree that if a motivated commission person did the same thing that these folks did, they would be making a sales presentation. So a couple of responses. You mentioned that an agent is someone who acts with authority to do it. They did not have authority to make sales. They did not have a – if the notary got to a meeting and the consumer, who had previously worked all of this out with the sales agent over the phone, if at the in-person meeting the consumer said, actually, I want to enroll additional debt into the program, the notary would not have authority to change the terms of the representation. The notary would have to refer that back to the actual sales agent who was at the call center. So there was no authority to make a sale here. Well, if I hear you right and it was all worked out before the face-to-face meeting took place, then what's the purpose of the rule? The purpose of the rule is to – and this is very explicitly spelled out in the Federal Register and in the FTC's guidance, which I will happily tell you, which is to protect consumers from being taken advantage of by anonymous, faceless individuals in call centers. But you're saying that the anonymous, faceless individuals already sold them. And that's exactly – So all you need is somebody to show up. But that's the problem. That's exactly the problem, is that the – and the telemarketers – There shouldn't be a sale until there's a face-to-face meeting. Exactly. And so everything you're saying, Judge Jacobs, is exactly what the illegality is here and is exactly why the process here entirely subverts the purpose of the TSR, because you're supposed to be able to have a face-to-face interaction with someone in order to judge their credibility, say to yourself, can I really trust this person before I enter into a very significant financial transaction that has huge effects on your credit and ability to get financing for the rest of your life. And the point of the TSR is to allow that consumer to have that face-to-face interaction and not be exploited by an anonymous call center employee. We also kind of skipped over the overarching way it's supposed to work is no advance payments. Correct. In a debt consolidation. Correct. But there is this exception which would allow advance payments. That's right. If there's a face-to-face meeting. That's right, yes. That's what this case is about. That's exactly right. That's exactly right. And I do want to clarify that this advance fee model is exactly what the FTC was targeting in 2010 when it amended the TSR. And that was a time in 2010 where consumer debt was proliferating as a result of the 2008 crisis, and they were seeing a lot of these sort of schemes operating. And that's exactly what was happening. And there's tons of findings about this to the effect that the advance fee model itself is what causes injury to consumers. Because this is consistent with what we've seen in this case, but the FTC found that in these types of schemes, approximately two-thirds of consumers drop out of the program before they're able to graduate debt-free as promised. And because they're dropping out early, they're just paying tons of fees. And, A, you know, being left poor because of that, and then also having their credit wrecked. And, you know, in some cases we have evidence in this case of wages being garnished and consumer bank accounts being frozen. I want to also mention – well, I'll just – I have a – Yes. There is – the district court made a finding that far more money was paid in fees than actually went to debt reduction. Yes. What was the evidentiary support for that? So there's two sources, Your Honor. One is from the receiver's report, which Mr. Elliott believes was not properly in evidence, but we believe it was. It was agreed to be admitted as PX-76. In any event, that receiver's report does say that since 2017, 70% of consumers in the program dropped out before getting the benefit of the bargain. And of that group, they paid $65 million more in fees than they achieved in debt settlements. And so even if you were to disregard the receiver's report, their own expert showed the exact same thing directionally, which is that Greg Reagan testified at the hearing, and there's PowerPoints in the record that he relied on that he presented, that based on a smaller sample of clients of the Monarch Law Group, 44% of them, so nearly one in two consumers, dropped out. And that group of consumers paid – Well, isn't that always going to be the case when people make advance payment of fees, that they pay out more than they're getting up to a certain point? I mean, that's what it is when you put a down payment on a garment or a vehicle. No. You haven't gotten anything yet. No, of course. Because the vehicle hasn't been delivered. Of course. But the benefit of the bargain for the consumer is, let's say I'm making – before I enter this program, I'm making credit card payments of $1,200 a month. And so the strategic signs me out by saying, stop paying accreditors. You don't have to pay them $1,200 a month. Just pay us $600 a month. And so the way this is working is that they're making the $600 monthly payment, but at least for the first 9 to 18 months of the program, up to 99% of that money is going to fees through strategic. It is not going to building settlement reserves. So when you, in many cases, inevitably fall behind on your payments – On your payments to strategic. To strategic. And there's a lot of testimony about this. Consumers sort of expected that they had been – some of their debt had been being paid off as they were making payments to strategic. But it turns out there was actually next to no money in the settlement reserves. So not only were they just paying fees for nothing in exchange, they were paying fees in exchange for debt settlement. But in many cases, in all cases, and they testified at the PI hearing that the fees are heavily front-loaded, and that's, again, consistent with the FTC's finding about this sector in general. That's by design. And so I would say that the dropout rate, I think, is a feature and not a bug of this program. And that's, again, reflected in the FTC's findings as well. So I do want – Can you explain to me why it was necessary to have a full asset freeze? Yes. And proceed with speed? Yes. I was just getting there. So the evidence in the record – and I want to dispute the contention that there was no evidence regarding asset dissipation and the need for a freeze. There was, and I'll get to that in a moment, and this is spelled out a little bit more specifically by the district court in its decision denying the motion for a stay pending appeal. But there was evidence in the Hansen Declaration that went back to 2016, but as recently as 2020 or 2021, I believe, that tens of millions of dollars were transferred out of the business. We just heard Mr. Elliott say this is a $1 billion business, and they said that in their briefs too. The receiver's reports show that there was $7 million left in the business at the time. It's a very thinly capitalized business. And the district court found, and I think this is just a very conservative estimate, that Strategic had collected over $100 million in illegal advance fees. So without freezing the assets of the individual defendants, who had already been shown to have siphoned tens of million dollars out of the business into trusts and entities controlled by them, there would be a wildly insufficient amount of money to pay restitution to consumers to say nothing of the civil penalties. And so, again, I would – Mr. Elliott mentioned the Hansen Declaration. That is found at the Hansen Declaration, and I think that's very much on point. Is that because the government wouldn't be able – or the governments would not be able to get to the trusts? I'm just trying to understand. So they moved – there's some evidence of moving funds to trusts, you said? Yes. Okay. There's – yeah, so there's – that's the reason why we had to freeze not just the corporate assets but also the individually controlled entities. And then additionally, there was also record evidence, and this is, again, detailed in the Hansen Declaration, I think, primarily, and the other declaration submitted with the TRO, about defendants' histories of changing banks, of using very elaborate corporate structures to kind of obscure certain things. Was there a finding that that was – it was with the intention to conceal or obscure? I don't believe there was a finding regarding any scienter, but there was a finding that this was happening and it was going to make recovery very difficult down the road. Is that the standard? Dissipation – or dissipation of assets, yes. Well, no, no, no. Not dissipation of assets, but making – discovering where the assets are more difficult down the road. Is that standard? I mean, that is part – one of the factors for appointing a receiver is sort of to help disentangle the corporate structure to figure out where all the assets are located. And the overriding standard for an asset freeze is simply likelihood of success on the merits, which the district court found in spades here, and did also, moreover, find a likelihood of asset dissipation. Just quickly to return to this pencil-whipping comment. Do you understand what that means? I take it to mean that it's just, you know, making people sign really quickly before you know what they're doing, something to that effect. And, you know, in that call, that recorded call, they also called the presentation CYA, which I think we know what that stands for – fluffy and also not as meaty as we make it sound. Now, Mr. Elliott, I reject the suggestion that we were trying to fool the court about what year this happened in. It did happen in 2018, and they said, oh, this was outdated, but at no point did they come forward and show what changed since then. And so, again, we had a full two-day evidentiary hearing, and they did not make an attempt to show that, yes, maybe things were subpar back then, but look at all the new rigorous procedures. Isn't that your burden? It's our burden to establish that the face-to-face – well, actually, I should say no, that's not true. The application of the face-to-face exemption is an affirmative defense, so it is actually their burden. We believe that we nonetheless did satisfy that burden, even if it had been on us, but they do have some responsibility if they're going to attempt to controvert this evidence. That's what the hearing was for, and they didn't do that. I just want to briefly touch on – Have we – just on that legal issue, because you do note that it is an affirmative defense, have we said anything about that? In other words, because if you're right, then even in the context of this particular set of issues, presumably, as I think out loud, they would have the burden of showing that things had changed since 2018. But have we said anything about this that you're aware of? I'm sorry, are you talking about this exemption in particular? I don't believe so. And so just to briefly touch on the two motions that are pending before this panel, one is the Loper-Bright motion that was discussed earlier. So I think I heard Mr. Elliott say just now that he admits that the rule as written is not inconsistent with the statute. That would be the sum and substance of a Chevron, or now we call it Loper-Bright, I guess, argument. That's never been what this case is about, and he just said so right now as well. This case has never been about the validity in the first instance of the TSR and whether the FTCs and the TSAs... Well, what if there are two ways of reading a statutory text? But the argument has never been that it's ambiguous. Loper-Bright would say we make that call, even if both of them are consistent with the statute. The case has never been about any purported ambiguity. The case has always been, and I believe Mr. Elliott just confirmed as much just now, this case has always been about whether the concededly valid interpretation of the statute is applicable on the facts of this case. So the Loper-Bright argument is totally a red herring, and in any event, I mean, Loper-Bright was decided in June, and the reply brief here was filed in September and didn't mention anything about it. And then I also just want to briefly touch on the motion to dismiss the parallel appeal. We filed a motion to dismiss that appeal for lack of appellate jurisdiction. That's docket number, I believe, 241541. That is an appeal by the Bluss Trust alone. Our position is that it's entirely duplicative of this appeal for the following reason. The Bluss Trust is a defendant and an appellant in this docket number, and you look like you're about to ask me a question. And... Who represents the Bluss Trust here? I do. Okay. And I don't think that's a special argument. It's not a special argument, but it was referred to, that motion was referred to the merits panel for this case. And so I understand that you are the panel that will be responsible for that motion. So I just wanted to briefly touch on it, which is just to say that the Bluss Trust is signed on to the appellant's brief here, and... Well, you know, he's back there shaking his head. So why don't we, if you want to submit something further...  I mean, my only point is just that I just wanted to sort of remind the panel that it is pending before this court, and for the sake of judicial economy, I would urge the court to address that perhaps before the entire appeal, just to obviate the need for gratuitous briefing and argument in that case. Okay. Okay. Unless there are further questions, we ask the court to affirm the PI and also to dismiss the parallel appeal for lack of appellate jurisdiction. Thank you. Thank you. I want to try and respond to Ms. Rosenbluth's arguments, and so I may have to skip around a little bit, but I would like to start with the Loper-Bright issue. We did raise it in our reply brief pages 16 and 17, and I want to be very clear. We have some issues with the TSR as a whole, and we do think there are some issues with other parts of the TSR. My comment before, when I was saying that we think that it is consistent with the statute as written, was really limited to the way that the face-to-face requirement is drafted, because that's really what's before you today. We feel that the way the face-to-face requirement is drafted, which is essentially an absolute exclusion, is consistent with the statute. You raised the question of burden, and I'm very pleased that you did because I didn't get to that initially. There is a back-and-forth in the papers on who has the burden with respect to the face-to-face, and we very strongly commend on you the Seventh Circuit's opinion in the EEOC versus City Club case, which would say that the government has the burden, and the thrust of that case, or the thrust of that opinion, was really you can call it an exemption, an exclusion, a limitation. You can do whatever you want. But setting labels aside, sometimes an exemption is truly an exemption. There's a class of individuals or people that are covered, and the agency decides to exempt some of them. But in other times, something that's called an exemption is really just a limitation by the agency on its own jurisdiction. And in that circumstance, the agency has the burden of establishing that the defendants are within the limit of that jurisdiction, and that's what's going on here. By exempting sales transactions that include a face-to-face component, the FTC is really saying these aren't subject to the rule. That's a limitation on their own jurisdiction, and we would urge you to accept the EEOC case on that. With respect to the asset freeze and the receiver, Ms. Rosenbluth cited the clear error standard, and my reaction to that was clear error standard requires evidence. And in this particular case, the government presented no evidence at the hearing on the asset freeze or the receivership, none. What she said was all that it needed to show was the likelihood of asset dissipation and that there was, based on, I think, the receiver and some other information, that there was some evidence that the assets were being moved to, in the individual cases, trusts, and that other assets were just being dissipated. And I'm very happy to address that. There was no evidence. And the way she presented the receiver's report was to make it look like there could be a reasonable disagreement as to whether that was an evidence or not. It wasn't. The record's very clear on this. The receiver filed that report the night before the hearing. The first day of the hearing, and it wasn't on the government's list. The government's exhibit list is docket number 109. It's not in the appendix, but it's docket number 109. The receiver's report wasn't on their list. The first day of the hearing, the government tried to use the receiver's report, and we objected, and the court sustained it. The trial court said, I'm not going to let you bring this in right now. We objected. We said, we haven't seen it. He's not testifying. This is hearsay. That's in pages appendix 1469 to 1473. Is the receiver's report in part of the appellate record? I think the receiver's report is in the appellate record. So it's before us. Well, but it wasn't in evidence below. It was absolutely not in evidence below. The trial court the second day started off the hearing by saying, Well, I've now reviewed this. What is this? He said, I'm not going to waste my time on this report. It was never admitted into evidence, and we objected repeatedly and said, The receiver is in the courtroom. If the receiver wants to testify, if the government wants to call the receiver, and somebody wants to testify to these conclusions, then let's do that. Because this report is full of hearsay, unsubstantiated opinions, incomplete facts. We'd like to understand how he put it together. They never presented him. Does the evidence in the record show how much money was taken in, how much money was used to reduce debt at the clients, and how much was in the coffers of the corporation? The evidence that the government put in. I heard what she said. I'm just asking you now. And I will. I promise. The evidence the government put in ended at 2021. We put in evidence for a representative law firm, which was Monarch, which is one of the law firms. We put in evidence about how the money is used, how it goes forward. To answer your question, there's nothing in there about under, the record is nothing about undercapitalization or money going sideways. None of that's in the evidentiary record. I didn't ask about where the money went. I mean, if it went somewhere, it was probably sideways. But I'm just asking whether the record shows roughly how much money was taken in as of some point, how much had been used to reduce debt, and how much was in the coffers of the company. So I can tell you, I think that's, there's sort of two separate questions there on how much was used for debt. I can give you the Monarch numbers. And what the Monarch number showed is that if you compare the face amount of the debt versus the face amount of settlements versus fees, the Monarch clients were about $12 million better off than they were at the interest component in that. In other words, in addition to just the face amounts of the debt, you look at the interest saved, the benefits to the clients of Monarch was about $25 million. So Monarch is one of the firms? Correct. And there are how many firms? There were about 28 different firms. A couple dozen firms. So that's a representative example. Some of the firms are bigger than others, but that's the representative example. That's what was in the record on that. Now, Ms. Rosenbluth is correct. What the evidence showed is that for people who are only in the program for a couple months, three, four months, they're going to lose money because they're paying in fees for services that they're not going to get. Eight months is about the breakeven point. At about eight months, clients start to see appreciable benefits. And the further in they are, the better the benefits they are. Now, that's not a surprise to the clients. Because one of the feature points in the PowerPoint presentation is to say, you are signing up for a multi-month program. You are in a position where you have a lot of debt. And depending on the client, it could be a 24-month program, 36, 48, 42. But if you're going to retain us, you need to be in this for the long haul. Thank you very much. Okay. If I may just make. I'll give you that. Thank you, Your Honor. Thank you. We'll reserve the decision.